UNITED STATES OF AMERICA    :

       v.           :         CRIMINAL NO. 26-CR-33

ROSE CENTENO        :

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Rose Centeno exploited and stole from the Pennsylvania Medicaid system—a program designed to support low-income Pennsylvanians—by fraudulently claiming for years that she was providing personal care services to her family member. Despite living in a household with a healthy income, Centeno pocketed money from this program designed to protect the most vulnerable Pennsylvanians. The government found many instances where, instead of providing services, she was spending time toward her personal lifestyle, such as going to the nail salon, spending time at her home on the Jersey shore, and going on vacation to Florida—all while falsely claiming that she was tending to her sister, who was medically certified as needing these personal care services. Because Centeno put her needs above others, and because defendants like Centeno put the Pennsylvania Medicaid program at risk by emptying its coffers through these fraud schemes, the government recommends a sentence of incarceration at the high end of the advisory guideline range—18 months—absent any basis for a below-guideline sentence addressed in the supplemental sealed attachment to this sentencing memorandum.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1]

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

## I.  BACKGROUND

On February 3, 2026, the defendant pled guilty to one count of health care fraud, in violation of 18 U.S.C. § 1347. During her plea colloquy, the defendant admitted that she applied

---

[1]  Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

to be a personal assistance worker for her family member in March 2021 through her employer, Agency #1. From May 2021 through April 2025, the defendant claimed to provide personal assistance services to that family member, which were reimbursed by a Pennsylvania Medicaid contractor to Agency #1. Agency #1 paid Centeno for the work she claimed to provide to her family member.

But instead of providing those personal care services to the family member—who was found to need these services based on her disabilities—the defendant made false "clock ins" and "clock outs," fraudulently claiming to provide those services to the family member when she was instead, for example, in Florida, at her home on the Jersey shore, or engaged in other personal activities. Centeno made those false entries on her own or, on other occasions, directed the family member to make them on her behalf. Centeno knew that the care she purported to provide had not been rendered and that the entries made were false.

By performing or causing to be performed such false entries, the defendant caused the Pennsylvania Medicaid contractor to be billed for services allegedly rendered to the family member, when in truth and in fact, and as the defendant well knew, the care had not been rendered. The Medicaid contractor paid Centeno's employer, Agency #1, based on those false entries, and Agency #1 paid Centeno based on those false entries.

## II.  SENTENCING CALCULATION

### A.  Statutory Maximum Sentence.

The maximum sentence that may be imposed on the defendant is a term of imprisonment of 10 years, a term of supervised release of three years, a fine of $250,000, and a special assessment of $100, along with restitution up to $334,033.10.[2]

### B.  Sentencing Guidelines Calculation.

#### 1.  Overall Calculation

The Probation Office correctly calculated the defendant's advisory guideline range as follows:

(i)  *Base Offense Level.* Because the defendant pled to health care fraud, in violation of 18 U.S.C. § 1347, the base offense level is 6, pursuant to USSG § 2B1.1(a)(2).

(ii)  *Specific Offense Characteristics*. The loss amount is disputed by the parties. The government concurs with Probation's determination that 12 levels should be added, pursuant to USSG § 2B1.1(b)(1)(G), because the loss is more than $250,000 but less than $550,000, specifically $334,033.10. The government further addresses this in the section below.

---

[2] After discussions with Probation and defense counsel in drafting the PSR regarding the loss amount, the Medicaid contractor, AmerihealthCaritas, provided the government with an update loss figure. The loss figure was marginally adjusted lower from the prior figure. AmerihealthCaritas advised the government that the total amount paid to Agency #1 for the period of May 18, 2021 through April 23, 2025 for the care provided by Centeno to the family member totaled $334,033.10. This revised figure is the number that should be used for both the loss amount and the restitution figure, as further discussed below.

In addition, as further explained below, the loss/restitution figure is different than the proceeds figure for forfeiture, since Centeno did not directly receive all of the funds paid by AmerihealthCaritas. She instead received a wage from Agency #1, which was a lower amount than the total amount reimbursed by AmerihealthCaritas to Agency #1. That proceeds amount for forfeiture is $208,754.86.

(iii) *Acceptance of Responsibility*. Centeno demonstrated acceptance of responsibility for her offense, making her eligible for a two-level downward adjustment under USSG § 3E1.1(a).[3]

(iv) *Timely Notification*. Centeno assisted authorities in the investigation or prosecution of her own misconduct by timely notifying the government of her intent to plead guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently, resulting in a one-level downward adjustment under USSG § 3E1.1(b).

(v) *Zero-Point Offender*. Centeno is also a zero-point offender and eligible for a 2-level downward adjustment pursuant to USSG § 4C1.1.

This results in a total offense level of 13. With a criminal history category of I, the defendant's guidelines range is 12 to 18 months.

### 2. Loss Calculation Specifically

As mentioned above, the only point of contention in the Guidelines calculation is the loss amount in this case. The government concurs in Probation's view on how to calculate the loss amount.

Defendant Rose Centeno engaged in a systematic fraud scheme, designed to exploit and extract money from the Pennsylvania Medicaid system, by failing to care for her family member who was certified as medically disabled and needing these personal care services. Centeno "clocked in" almost daily, claiming to provide these services, from May 2021 through April

---

[3] The government notes, however, that Centeno still seems to be minimizing, claiming that she "did a wrong thing for the right reasons."

2025. Due to those clock ins, the Pennsylvania Medicaid contractor paid her employer, Agency #1, $334,033.10, and Agency #1 paid Centeno $208,754.86 for those purported services.

But in its investigation, the government identified numerous examples of fraud, where Centeno was focused on her own personal lifestyle, rather than tending to her family member who was in need of these medical services. In addition, there is ample evidence that Centeno was herself physically incapable of acting as a personal care worker due to her own medical conditions and her oxycodone dependence, which she outlined in great detail to Probation and in her Sentencing Memorandum. Because the government has offered a *prima facie* case that Centeno's overall billings were fraudulent, the burden of production shifts to the defense to establish that the government's evidence is somehow incomplete, inaccurate, or that the loss amount should be narrowed. *See United States v. McClure-Potts*, 908 F.3d 30, 40 n.12 (3d Cir. 2018). But for the reasons outlined below, that is a burden the defendant is unable to meet, at least not in any meaningful way that would reduce the loss amount below the $250,000 threshold.

> ### a. Total Amount Reimbursed by the Medicaid Contractor

Defendant Rose Centeno was employed by Agency #1 between 2021 and 2025 to provide these personal care (*i.e.*, home health) services to her family member, who was part of the Pennsylvania Medicaid Community HealthChoices program. That program empowered Medicaid to pay for home services provided to Medicaid recipients like Centeno's family member who otherwise would need to live in a nursing home because of a disability. Centeno was required to "clock in" and "clock out" each day she purported to provide services. Based on those clock-ins, Agency #1 would submit claims to the Pennsylvania Medicaid contractor, which detailed the purported services that Centeno claimed to have provided to her family member. The

Medicaid contractor would then reimburse Agency #1 based on those claims. In this case, the Pennsylvania Medicaid contractor paid Agency #1 a total of $334,033.10 for the care that Centeno purported provided to her family member between May 18, 2021 and April 23, 2025. *See* Exhibit A (Centeno Analysis spreadsheet, Summary Billings tab). This is the relevant figure for the loss amount here.

### b. Numerous Instances of Fraud

Despite claiming to provide services to her family member, whose Medicaid enrollment and disabilities qualified her to receive these personal care services, the government's investigation revealed numerous instances where Centeno was tending to her own personal lifestyle, while enriching herself through these false billings to the Medicaid program. *See* Exhibit A (Centeno Analysis spreadsheet, Fraud Examples tab).

For example, on June 26, 2023, FBI surveillance showed that Centeno and her husband went to the Penrose Diner and went to the nail salon, all while "clocked in," claiming to provide personal care services to the family member.

In another example, from February 12, 2024 through February 16, 2024, false clock ins/clock outs were entered for Centeno, despite the fact that records show she was on vacation in Florida, when she was supposed to be providing services to her family member. Just during that short trip, Centeno caused billings of $1,587.10 to the Pennsylvania Medicaid contractor for work she never completed. Centeno did the same thing from November 10, 2024 through November 15, 2024, on another trip to Florida, all while causing false billings to Medicaid of $1,850.72.

In another example, on March 18, 2024, FBI surveillance showed that Centeno was seen arriving at Chick-fil-A, then Dunkin' Donuts, then going to the nail salon—all while falsely "clocked in" claiming to provide services.

On numerous dates, records showed that rather than tending to her family member in need, Centeno was going to her home on the Jersey shore. For example, in the summer of 2024, the investigation showed that Centeno was in New Jersey, failing to tend to her family member, despite fraudulent claims indicating otherwise on:

May 24-27, 2024;

June 1-2, 2024;

June 8-9, 2024;

June 14-16, 2024;

June 18, 2024;

June 21-23, 2024;

June 26-30, 2024;

July 2-5, 2024;

July 7-14, 2024;

July 17-22, 2024;

July 26-29, 2024;

July 31, 2024;

August 1-4, 2024;

August 7, 2024;

August 10-11, 2024;

August 16-18, 2024; and

August 30-September 1, 2024.

This was no accident and was instead part of a deliberate scheme orchestrated by Centeno. This is made clear by a series of text messages, on October 3, 2024, where Centeno directed her family member to clock in on her behalf to falsely record that Centeno had showed up to provide services when she had not:



*See* Exhibit B (RC texts with EC).

Not only are there specific instances of an orchestrated fraud scheme by Centeno, but the evidence shows that Centeno was herself physically incapable of providing these personal care services to her family member. Centeno detailed her extensive medical history and conditions in her discussion with Probation, which are corroborated by her medical records and her Sentencing

Memorandum. Other records also corroborate that she had extensive medical issues, particularly her receipt of oxycodone prescriptions. Centeno received approximately 99 prescriptions for oxycodone, for an approximate total of 19,350 pills, from at least as early as 2017 through 2024. Even during the limited time frame when this fraud scheme was occurring, from 2021 through 2024, Centeno received monthly prescriptions for these potent Schedule II narcotics, based on her extensive medical issues.[4]

But above all else, only a year before she started claiming to provide services, Centeno was herself certified by a physician as eligible to receive personal care services. *See* Exhibit C (Rose Centeno Physician Certification). In that document, after listing her medical conditions, the physician certified Centeno as being "Nursing Facility Clinically Eligible": "[t]his individual has an illness, injury, disability or medical condition diagnosed by a physician; and as a result of the illness, injury, disability or medical condition, the individual requires the level of care and services provided in a nursing facility above the level of room and board." The physician also certified that the "length of care required related to the diagnosis listed" was "Long Term – Condition or disability is anticipated to last 12 months or longer." That certification is corroborated by Centeno's complaints to Probation about her ongoing medical issues. The physician certification in 2020 went on to certify that Centeno needed assistance with "Self-Care," "Learning . . . trouble with use of hands," and "Capacity for Independent Living."[5]

---

[4] The government has previously made clear to both Probation and defense counsel that it has concerns about the medical legitimacy of these prescriptions. Nonetheless, they are one piece of information for the Court to consider in reviewing the totality of evidence indicating that Centeno was not providing services to her family member.

[5] The government recognizes that this same physician, only a year later on April 12, 2021, signed an "employee medical physical" form for Agency #1, claiming to have examined Centeno and "found no condition that should prevent or interfere with the home care aid duties. I have

*continued . . .*

### c. The Government's Prima Facie Case Shifts the Burden to the Defendant.

Overall, the investigation revealed that Centeno had engaged in numerous instances of fraud; that she had medical conditions which led a physician to certify that Centeno herself needed personal care services; and that she deliberately orchestrated the fraud scheme by directing her family member to clock in/out for her. There is ample evidence in this case that the overall billings by Centeno were all part of the overall fraud scheme. The government has presented a prima facie case as to the total amount of the loss, and the burden therefore shifts to the defendant.

The Third Circuit's burden-shifting framework was outlined in *United States v. McClure-Potts*, 908 F.3d 30 (3d Cir. 2018). The defendant in that case took issue with the loss calculation, arguing that there was insufficient evidence as to full scope of the loss amount. The Third Circuit outlined the burden-shifting framework that applies here: "'The Government bears the burden of establishing, by a preponderance of the evidence, the amount of loss for purposes of sentencing enhancement.' Once the Government makes out a prima facie case of the loss amount, however, the burden of production shifts to the defendant to provide evidence that the Government's evidence is incomplete or inaccurate." 908 F.3d at 40 n.12 (quoting *United States v. Jimenez*, 513 F.3d 62, 86 (3d Cir. 2008)).

As in *McClure-Potts*, the evidence outlined above provides more than sufficient evidence for a prima facie case by the government that the totality of the claims submitted for Centeno's services were fraudulent. Therefore, the burden of production shifts to the defendant to make any

---

found no specious signs or symptoms which might pose a health hazard for consumers under his/her care and no evidence of a communicable disease, including tuberculosis." But again, the physical disability certification in 2020 is entirely consistent with the medical conditions that Centeno has herself detailed to the Court.

attempt to reduce the loss amount here. The government has seen no such evidence from the defendant satisfying that burden thus far other than conclusory, self-serving statements from the defendant claiming that only 25% of her entries were fraudulent. Defendant's assertion lacks any support to corroborate these self-serving statements; fails to provide any specificity as to the individual claims that she insists were legitimate; and fails to overcome the substantial evidence put forward by the government showing that the overall billings were all part of the fraud scheme, including the defendant's own medical conditions precluding her ability to provide such services. Defendant's statement fails to carry her burden to overcome the government's prima facie case.

## III.     ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

A.     **Consideration of the 3553(a) Factors Regarding Imprisonment.**

*Nature and Circumstances of the Offense.*

The defendant's multi-year fraud scheme—exploiting the Pennsylvania Medicaid program by prioritizing her own personal lifestyle over that of her family member who was medically certified to need the services—amounted to a serious offense. The Medicaid program is publicly financed to support Pennsylvania's neediest and most vulnerable citizens. This particular component of Medicaid, the Community HealthChoices program, is designed to provide the necessary support for Medicaid recipients who are medically eligible, to help them avoid moving to a nursing home and empowering them to stay in their own homes with the support of a personal care worker. This publicly funded program helps those individuals through the work of employer home care agencies, like Agency #1, and their workers, like Centeno. The program is set up to rely upon honest, truthful representations when the agencies and their workers claim to provide necessary services to Medicaid recipients like Centeno's family member.

But the offense conduct here involved Centeno abusing this public benefit program, by instead going to the nail salon, going to her home at the Jersey shore, and going on vacation to

Florida—all while getting paid hundreds of thousands of dollars in public funds that were set aside for Pennsyvlania's poorest citizens. Centeno herself orchestrated this fraud scheme, directing her family member when to clock in and out, making those entries that fraudulently claimed to provide services when she was instead enjoying her comfortable lifestyle. Centeno made a substantial amount of money on this scheme, at the detriment of the Medicaid program and her family member for whom she was supposed to be providing services.

Fraud is a very serious problem for the Pennsylvania Medicaid program, particularly for personal care services. Individuals like Centeno who engage in these fraud schemes put the program at risk financially, by taking funds for those who need them, and instead diverting them into the pockets of those who commit fraud on the program.

In addition, Centeno's conduct involved abandoning her own family member, who was medically certified as needing these services. The Community HealthChoices program is designed to keep people out of nursing homes, by providing support in their own homes. Centeno was supposed to be providing that support to her family member, but was instead enjoying her own personal lifestyle.

*History and Characteristics of the Defendant*.

Further, the defendant is a person who lived in a household with a fulsome income through her husband's employment. She enjoyed a lifestyle filled with trips and vacations. Even in that advantageous position, she committed a fraud scheme that took advantage of a program that was devoted to supporting the neediest Pennsylvania citizens. Her history and characteristics show that this was not a crime of desperation. She was an individual who had a comfortable lifestyle, but still engaged in the fraud. This too supports the need for a significant period of incarceration.

*Sentence that Reflects Seriousness of Offense, Respect for Law, Just Punishment.*

It is clear that the recommended term of imprisonment is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." § 3553(a)(2). A top-of-the-guidelines sentence would adequately show that exploiting the Medicaid program is a serious crime that deserves serious punishment. And while specific deterrence may be less relevant here, the recommended sentence of incarceration affords adequate general deterrence to others who would commit a similar offense. *Id.*

*Avoiding Undue Disparities.*

In addition, adherence to the recommended guideline range assures that the defendant's sentence is consistent with those imposed nationwide on similarly situated offenders, and thus complying with Section 3553(a)(6) and avoiding undue disparity.

*Educational/Vocational Training, Medical Care, and Other Correctional Treatment.*

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." § 3553(a)(2)(D).

*Restitution.*

Restitution is mandatory in this case. § 3553(a)(7). Restitution for the full amount of the claims paid for Centeno's purported services provided to her family member, at an amount of $334,033.10, should be paid to:

AmerihealthCaritas/Keystone First
Attn: Sheree Thompson (criminal restitution)
200 Stevens Drive
Philadelphia, PA 19113

Therefore, in sum, all of the appropriate considerations of sentencing favor the imposition in this case of a sentence at the high end of the guideline range, at 18 months. As noted, the

Sentencing Guidelines present "the lodestone of sentencing," *Peugh*, 569 U.S. at 544, and that guide is once again persuasive in this case.

**B.      Supervised Release.**

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a term of supervised release of some period of time is warranted. As explained above, the defendant presents a multi-year history of exploiting the Pennsylvania Medicaid program. She did this, knowing full well the impact on the public fisc and her family member, who was supposed to be receiving these services. Close supervision following release from imprisonment is warranted to aid her reentry to society and to protect the public. A term of

supervised release in this case advances the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), protect the public, § 3553(a)(2)(C), assure that the defendant continues to pursue education and vocational efforts that promote rehabilitation, § 3553(a)(2)(D), and pays restitution to victims, § 3553(a)(7). The Commission adds: "In a case in which a defendant sentenced to imprisonment is an abuser of controlled substances or alcohol, it is highly recommended that a term of supervised release also be imposed." § 5D1.1 app. note 3. Due to Centeno's long-term oxycodone prescriptions and her related addiction, supervised release would be helpful to ease her transition after incarceration.

This assessment also supports imposition of all of the mandatory and standard conditions of supervised release listed in Section 5D1.3.

## IV. CONCLUSION

For these reasons and subject to any that may be presented at the defendant's sentencing hearing and in the Sealed Supplement, the government believes that a top of the guideline range sentence that fully accounts for the scope and severity of the defendant's criminal conduct is appropriate in this case.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s Anthony D. Scicchitano*
ANTHONY D. SCICCHITANO
Assistant United States Attorney

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this Sentencing Memorandum has been served on the Filing User

identified below through the Electronic Case Filing (ECF) system:


Louis Busico, Esq.
133 N. State Street
Newtown, PA 18940


*/s Anthony D. Scicchitano*
ANTHONY D. SCICCHITANO
Assistant United States Attorney


DATED:  <u>May 12, 2026.</u>